IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PAULETTE EZE and PAMELA EZE SYLVESTRE, *as personal Representatives of the Estate of Presley Eze*,
ISAAC and LORETTA EZE, *parents of Presley Eze*,
PETE "OBI" EZE, *brother of Presley Eze*,
ELENA EZE, *spouse of Presley Eze*, and
VINCENT J. WARD, *as Guardian Ad Litem, of I.E.*,
*a minor child, of decedent Presley Eze*,

      Plaintiffs,

v.                                                                          No. 1:23-cv-00976-KWR-KRS

THE CITY OF LAS CRUCES and
BRAD JUSTIN LUNSFORD,
*in his individual capacity*,

      Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT LUNSFORD'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**THIS MATTER** comes before the Court on the parties' cross motions for partial summary judgment as to Count I against Defendant Lunsford (Doc. 165; Doc. 178). Having reviewed the parties' pleadings, exhibits, and the relevant law, the Court finds that Defendant Lunsford's motion (Doc. 178) is well-taken, and therefore, is **GRANTED**. Since Plaintiffs failed to meet their burden to survive qualified immunity, Plaintiffs' motion for partial summary judgment (Doc. 165) is **DENIED**.

**BACKGROUND**

This action arises from a fatal altercation between Defendant Brad Lunsford, a former Las Cruces police officer, and Presley Eze, the decedent, that occurred on August 2, 2022. Doc. 85 at

1 (Second Amended Complaint). Plaintiffs have brought this action against Defendants Lunsford and the City of Las Cruces alleging violations of the decedent's civil rights under 42 U.S.C. § 1983 and the New Mexico Civil Rights Act, as well as Loss of Consortium. *Id.* at 7–13. Defendant Lunsford and Plaintiffs both move for partial summary judgment on Plaintiffs' § 1983 claim against Defendant Lunsford. Doc. 165 at 1 (Plaintiffs' Motion for Partial Summary Judgment); Doc. 178 at 1 (Defendant Lunsford's Motion for Partial Summary Judgment).

## LEGAL STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996) (citation omitted). To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771–72 (10th Cir. 1988) (citation modified).

A "fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017).

Although a court must draw all "reasonable inferences . . . in the light most favorable to the non-moving party," *id.* at 1304 n.3, that party's "version of the facts must find support in the record," *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). At this stage, it is not a court's role to weigh the evidence or decide any issues of credibility, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Anderson*, 477 U.S. at 249, 255. Cross motions for "summary judgment are to be treated separately; the denial of one does not require the grant of another." *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (quoting *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007)).

When a defendant asserts qualified immunity at summary judgment, the "burden shifts to the plaintiff to demonstrate, on the facts alleged, that (1) the defendant violated her constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged unlawful activity." *Castillo v. Day*, 790 F.3d 1013, 1019 (10th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). If the plaintiff fails to meet "either part of this burden, the defendant is entitled to qualified immunity." *Id.* "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (citation modified).

The Court accepts "facts clearly depicted" in the video footage if it "dispel[s] any genuine dispute about those facts." *Baca v. Cosper*, 128 F.4th 1319, 1324 (10th Cir. 2025) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). In other words, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on a motion for summary

3

judgment. *Scott*, 550 U.S. at 380. If "the recording does not clearly depict an action, and the evidence can reasonably be interpreted to support either party's version of what happened, then [a court] must take the [non-moving party's] version of what happened." *Baca*, 128 F.4th at 1324.

**UNDISPUTED FACTS[1]**

On August 2, 2022, Defendant Lunsford was dispatched to a gas station in response to a shoplifting call. Doc. 179, Ex. D, LCPD Officer Brad Lunsford's Body-Worn Camera (PR000549) (hereinafter, "Lunsford BWC") at 2:18–3:08; Doc. 178 at 6 (DMF 4); Doc. 197 at 7 (PMF 4–9). Defendant Lunsford drove up to the gas station at 4:32 p.m. in a marked patrol vehicle, uniform, and badge. Lunsford BWC at 00:2:18–3:08; Doc. 178 at 6 (DMF 4); Doc. 197 at 7 (PMF 4–9). When Defendant Lunsford arrived, a clerk pointed at the vehicle Mr. Eze sat in and said, "black male. Front seat." Lunsford BWC at 2:33–40; Doc. 178 at 6 (DMF 5); Doc. 197 at 7 (PMF 4–9). Defendant Lunsford circled around and parked behind the vehicle Mr. Eze sat in. Lunsford BWC at 2:45–3:05; Doc. 178 at 6 (DMF 6); Doc. 197 at 7 (PMF 4–9). As the vehicle inched forward, Defendant Lunsford briefly activated his emergency lights and siren, and the vehicle came to a stop. Lunsford BWC at 3:00–12; Doc. 178 at 6 (DMF 6); Doc. 197 at 7 (PMF 4–9).

Defendant Lunsford walked up to the driver's side of the vehicle. Lunsford BWC at 3:12–20; Doc. 178 at 6 (DMF 7); Doc. 197 at 7 (PMF 4–9). John Singleton sat in the driver's seat, Mr. Eze sat in the passenger seat, and Daniel Villa sat in the rear passenger seat. Lunsford BWC

---

[1] The following facts are taken from the parties' motions for partial summary judgment, accompanying briefing, and admissible exhibits. Portions of the parties' undisputed facts do not appear in the Court's facts because the fact may be immaterial, not supported by the evidence, a characterization of the fact, or a legal argument. Additionally, some of the parties' facts are blatantly contradicted by the video evidence submitted, and the Court has adjusted the undisputed facts accordingly. Some facts included may not be material but provide necessary background context for the issues presented. Citations to Plaintiffs' material facts and Defendant Lunsford's material facts will be designated as "PMF" and "DMF," respectively.

at 3:20–30; Doc 178 at 6 (DMF 8); Doc. 197 at 7 (PMF 4–9). Singleton rolled his window down, and Defendant Lunsford asked, "What's the deal with the people inside?" Lunsford BWC at 3:19–24; Doc. 178 at 6 (DMF 9); Doc. 17 at 7 (PMF 4–9). Mr. Eze responded, "So I went up to the store with a beer in my hand, and I walked out of the store with a beer in my hand. Look at the cameras." Lunsford BWC at 3:25–32; Doc. 178 at 6 (DMF 9); Doc. 197 at 7 (PMF 4–9).

Defendant Lunsford asked Mr. Eze for his ID so he could go talk to the clerk and see the video footage, but Mr. Eze said he did not have his ID. [2] Lunsford BWC at 3:39–45; Doc. 178 at 6–7 (DMF 10). Defendant Lunsford asked Mr. Eze what his name was, and Mr. Eze responded "Pete," and Defendant Lunsford confirmed, "Pete?" Lunsford BWC at 4:23–26; Doc. 178 at 7 (DMF 10). Mr. Eze said, "Yeah." Lunsford BWC at 4:24–25; Doc. 178 at 7 (DMF 10). Defendant Lunsford asked for his last name. Lunsford BWC at 4:26. Mr. Eze replied, "Ezer," and Defendant Lunsford responded, "Huh? E-Z-E-R?" Lunsford BWC at 4:27–32; Doc. 178 at 7 (DMF 10). Mr. Eze nodded in the affirmative. Lunsford BWC at 4:27–30. Defendant Lunsford asked Mr. Eze for his birth date, address, and social security number. Lunsford BWC at 4:30–5:20; Doc. 178 at 7 (DMF 10). Mr. Eze gave a birthdate of March 8, 1990, an address out of El Paso, Texas, and a few mumbled numbers. Lunsford BWC at 4:30–5:20; Doc. 178 at 7 (DMF 10).

Defendant Lunsford then entered the gas station store and asked the clerk if Mr. Eze had come in with the beer, and the clerk denied that claim. Lunsford BWC at 6:41–50; Doc. 178 at 7 (DMF 11). Defendant Lunsford returned to his patrol vehicle and radioed dispatch the identifying

---

[2] Plaintiffs dispute DMF 10–13 and argue that "no reasonable inference [can] be made that Eze concealed his identity," and that the Court "can also reasonably infer that Lunsford did not clearly hear Eze." Doc. 197 at 7. The Court disagrees. The body-worn camera footage clearly depicts Mr. Presley Eze telling Defendant Lunsford that his name is Pete, confirming that his name is Pete, clearly stating "Ezer" before mumbling what could be Eze or Ezer, and then confirming the spelling of his last name as "E-Z-E-R." Lunsford BWC at 4:24–30. This blatantly contradicts the Plaintiffs' notion that "[t]here is no reasonable inference to be made that Eze concealed his identity." *See* Doc. 197 at 7. The body-worn camera clearly depicts several exchanges in which Mr. Eze gives false identifiers or confirms inaccurate information.

information Mr. Eze had provided him. Lunsford BWC at 8:00–35; Doc. 178 at 7 (DMF 12). Dispatch found no matches. Lunsford BWC at 10:07–11:49; Doc. 178 at 7 (DMF 12). After approaching the vehicle again, Defendant Lunsford asked Mr. Eze to spell his last name again to which Mr. Eze replied, "E-S-E-R." Lunsford BWC at 14:33–35; Doc. 178 at 7 (DMF 12). Defendant Lunsford confirmed, "E-S-E-R?" to which Mr. Eze said, "Yeah." Lunsford BWC at 14:33–35; *see* Doc. 178 at 7 (DMF 12). Dispatch ran this name and found no results. Lunsford BWC at 16:40–46; Doc. 178 at 7–8 (DMF 12).

Officer Keegan Arbogast ("Officer Arbogast") arrived at 4:46 p.m. in a marked patrol vehicle, wearing his full uniform, and displaying his badge. Doc. 179, Ex. E, LCPD Officer Keegan Arbogast's Body-Worn Camera Video No. 1 (PR000705) (hereinafter "Arbogast BWC 1") at 00:36; Doc. 178 at 8 (DMF 14); Doc. 197 at 8 (PMF 14). Defendant Lunsford briefed Officer Arbogast that Mr. Eze had allegedly shoplifted and gave no valid identifiers, and Officer Arbogast agreed to detain Mr. Eze before approaching the vehicle's passenger side. Arbogast BWC 1 at 00:36–1:21; Lunsford BWC at 16:59–17:44; Doc. 178 at 8 (DMF 14); Doc. 197 at 8 (PMF 14).

Defendant Lunsford opened the passenger side door and said, "Alright Pete, do me a favor, go ahead and step out." Lunsford BWC at 17:44–46; Doc. 178 at 8 (DMF 16); Doc. 197 at 8 (PMF 16–19). Mr. Eze did not respond for a moment and then asked, "Excuse me?" Lunsford BWC at 17:47–17:49; Doc. 178 at 8 (DMF 16); Doc. 197 at 8 (PMF 16–19). Defendant Lunsford repeated, "Step out for me, please." Lunsford BWC at 17:50–51; Doc. 178 at 8 (DMF 16); Doc. 197 at 8 (PMF 16–19). Mr. Eze shook his head and said, "No, I don't really want to get out." Lunsford BWC at 17:51–53; Doc. 178 at 8 (DMF 16); Doc. 197 at 8 (PMF 16–19). Defendant Lunsford responded, "Okay, well I'm not asking right now. Step out for me." Lunsford BWC at 17:52–53; Doc. 178 at 9 (DMF 17); Doc. 197 at 8 (PMF 16–19). Defendant Lunsford reached toward Mr.

6

Eze without touching him, and Mr. Eze leans back, pointing his phone camera at Defendant Lunsford, and stated, "Hold on, hold on, hold on. Why? Why? Can I know why?" Lunsford BWC at 17:54–57; Doc. 178 at 9 (DMF 17–18). Defendant Lunsford, while grabbing the Mr. Eze's forearm, explained, "Because you're not coming back on file, man." Lunsford BWC at 17:56–59; Doc. 178 at 9 (DMF 18). Officer Arbogast added, "Hey, step out of the car." Arbogast BWC 1 at 1:35–42; Doc. 178 at 9 (DMF 18).

Mr. Eze pulled back and asked again, "Can I know why?" Lunsford BWC at 17:58–59; Doc. 178 at 9 (DMF 19). Defendant Lunsford repeated, "Because you're not coming back on file for me." Lunsford BWC at 17:58–18:01; Doc. 178 at 9 (DMF 19). Mr. Eze asked, "What does that mean? What does that mean?" Lunsford BWC at 18:01–03; Doc. 178 at 9 (DMF 19). Officer Arbogast told Mr. Eze, "He can't figure out who you are." Lunsford BWC at 18:03–05; Arbogast BWC 1 at 1:39–41; Doc. 178 at 9 (DMF 19).

At this point, Mr. Eze asks, "What do you mean you can't figure out who I am?" Lunsford BWC at 18:03–05; Doc. 178 at 9 (DMF 20); Doc. 197 at 8 (PMF 20). Defendant Lunsford said, "Because it's not coming back on file. You better come out now, dude." Lunsford BWC at 18:05–08; Doc. 178 at 9 (DMF 20); Doc. 197 at 8 (PMF 20). Still leaning back into the vehicle, Mr. Eze then asked Singleton to take his phone and keep recording, and he handed his phone to Singleton with his right hand while Defendant Lunsford held on to his right forearm. Lunsford BWC at 18:07–10; Doc. 178 at 9 (DMF 20); Doc. 197 at 8 (PMF 20). Officer Arbogast asked, "Are you going to cooperate or what?" Lunsford BWC at 18:09–11; Arbogast BWC 1 at 1:43–48; Doc. 178 at 9 (DMF 20); Doc. 197 at 8 (PMF 20). Mr. Eze said, "I'm going to cooperate. Can you stop holding me? Can you stop touching me?" Lunsford BWC at 18:09–15; Doc. 178 at 9 (DMF 21); Doc. 197 at 8 (PMF 21). Defendant Lunsford began pulling Mr. Eze from the car and

explained, "I don't want you reaching for anything, man." Lunsford BWC at 18:14–18; Doc. 178 at 9 (DMF 21); Doc. 197 at 8 (PMF 21).

While Defendant Lunsford began pulling Mr. Eze from the car, Officer Arbogast spotted a closed pocketknife hidden underneath a metal water bottle on Mr. Eze's lap. Arbogast BWC 1 at 1:51–55; Doc. 178 at 9 (DMF 22); Doc. 197 at 8 (PMF 22). Officer Arbogast reaches to secure the pocketknife, but Mr. Eze's arm—which is being pulled by Defendant Lunsford—makes contact and blocks Officer Arbogast's initial reach.[3] Lunsford BWC at 18:17; Doc. 178 at 9 (DMF 22); Doc. 197 at 8 (PMF 22–23).



---

[3] The intent behind the contact of Mr. Eze's arm with Officer Arbogast's is disputed. Plaintiffs contend that Defendant Lunsford gripped Mr. Eze's arm which partially blocked Officer Arbogast's arm from reaching for the pocketknife. Doc. 197 at 8. Defendant Lunsford contends that Mr. Eze "slapped" Officer Arbogast's hand away. Doc. 178 at 10. It is unclear whether Mr. Eze contributed to pushing Officer Arbogast's hand away or whether Defendant Lunsford pulling on Mr. Eze's arm interfered with Officer Arbogast's first reach for the pocketknife. Since the Court first considers Defendant Lunsford's motion, the Court construes this fact in favor of Plaintiffs and notes that Defendant Lunsford pulled Mr. Eze's arm which interfered with Officer Arbogast's reach.

Lunsford BWC at 18:17.

Officer Arbogast then reached over Mr. Eze and Defendant Lunsford's arms and secured the pocketknife from Mr. Eze's lap. Lunsford BWC at 18:18–19; Doc. 178 at 10 (DMF 22); Doc. 197 at 8 (PMF 22–23). When Officer Arbogast secured the pocketknife, Mr. Eze contended that he was not reaching for anything and began to step out of the vehicle. Lunsford BWC at 18:17–20; Doc. 178 at 10 (DMF 23); Doc. 197 at 8 (PMF 23). While Mr. Eze exited the vehicle, his left arm—holding a metal water bottle and money—was positioned behind his body toward the seat.[4] Lunsford BWC at 18:19–24; Doc. 178 at 10 (DMF 24); Doc. 197 at 9 (PMF 24). Officer Arbogast commanded, "drop your shit, drop your shit," and Mr. Eze dropped the water bottle and money inside the vehicle. Lunsford BWC at 18:21–25; Doc. 178 at 10 (DMF 24); Doc. 197 at 9 (PMF 24). Defendant Lunsford said, "Dude, stop!" Lunsford BWC at 18:27.

Officer Arbogast ordered Mr. Eze to turn around. *Id.* at 18:24–26; Doc. 178 at 10 (DMF 25); Doc. 197 at 9 (PMF 25). The officers attempted to turn Mr. Eze around, but he tensed and resisted. Lunsford BWC at 18:26–28; Doc. 178 at 10 (DMF 25); Doc. 197 at 9 (PMF 25). Once turned around, Mr. Eze attempted to move away from the officers but only moved from the rear-passenger window to the rear quarter panel of the vehicle before the officers stopped him.[5] Lunsford BWC at 18:28–31; Doc. 178 at 10 (DMF 26); Doc. 197 at 9 (PMF 26). At this point, Officer Arbogast had both arms wrapped around Mr. Eze's waist and Defendant Lunsford had one

---

[4] Plaintiffs dispute the characterization of Mr. Eze "hiding" his arm behind his body. The video evidence does not blatantly contradict Plaintiffs' version that Mr. Eze held his arm behind him "because of the lack of space," and thus, for the purposes of Defendant Lunsford's motion, the Court accepts Plaintiffs' version of this fact.

[5] The characterization of this fact is also disputed. Defendant Lunsford contends that Mr. Eze "bolt[ed]" toward the rear of the car and "drag[ged]" the officers along. Doc. 178 at 10 (DMF 25). Plaintiffs argue that Mr. Eze "does tense his body" and "tries to move away from them but only successfully moves a couple of feet." Doc. 197 at 9 (PMF 25). Again, given that the Court considers Defendant Lunsford's motion first, the Court construes this fact in favor of Plaintiffs.

9

hand on Mr. Eze's torso and one on his right wrist. Lunsford BWC at 18:31–32; Doc. 178 at 10 (DMF 25); Doc. 197 at 9 (PMF 25–26). Mr. Eze placed one hand on the rear passenger door handle, where Mr. Villa sat, and barely opened the door. Lunsford BWC at 18:32; Doc. 178 at 10–11 (DMF 27); Doc. 197 at 9 (PMF 27). Lunsford immediately pushed the door closed and yelled, "Stay in the fucking car!" Lunsford BWC at 18:33; Doc. 178 at 10–11 (DMF 27); Doc. 197 at 9 (PMF 27).



Lunsford BWC at 18:33.

Officer Arbogast, positioned behind Mr. Eze with both arms wrapped around his waist, took Mr. Eze to the ground in an attempt to control him. Lunsford BWC at 18:36–38; Doc. 178 at 11 (DMF 28); Doc. 197 at 9 (PMF 28). Officer Arbogast landed on his back, and Mr. Eze landed, on his back, on top of Officer Arbogast. Lunsford BWC at 18:37; Doc. 178 at 11 (DMF 28); Doc. 197 at 9 (PMF 28). Within three seconds, Mr. Eze had turned around and was face-to-face with Officer Arbogast. Lunsford BWC at 18:37–40; Doc. 178 at 11 (DMF 30); Doc. 197 at 9 (PMF 30).

10

Officer Arbogast wrapped his legs around Mr. Eze's left leg, and Defendant Lunsford attempted to pull Mr. Eze off Officer Arbogast. Doc. 179, Ex. K-1, Bustamante Cell Video Zoomed and Slowed (hereinafter "Bustamante Video Slowed"), at 00:08–12; Doc. 178 at 11 (DMF 30); Doc. 197 at 10 (PMF 30). Mr. Eze resisted both officers by pushing himself off the ground, at times directly pushing off Officer Arbogast, and by resisting Defendant Lunsford's attempts to pull him off Officer Arbogast.[6] *See* Doc. 179, Ex. L, Officer Keegan Arbogast's Body-Worn Camera No. 2 (PR0000712) (hereinafter, "Arbogast BWC 2"), at 00:11–13; *see also* Bustamante Video Slowed at 00:11–32; Doc. 178 at 11–12 (DMF 30–32); Doc. 197 at 9 (PMF 30–32). Defendant Lunsford is 5 feet 6 inches tall and weighed 155 pounds at the time of the shooting. Doc. 197 at 8 (PMF 15); Doc. 197-4, Lunsford Deposition at 97:4–14. Mr. Eze was 6 feet 2 inches tall and weighed 211 pounds. Doc. 178 at 8 (DMF 15); Doc. 178-2, Ex. F, OMI Report at 2. Following the takedown, the struggle continued in this fashion for approximately twenty-two seconds. Lunsford BWC at 18:38–19:00; Doc. 178 at 12 (DMF 32); Doc. 197 at 10 (PMF 32).

During the struggle, Mr. Eze repeatedly said "stop it." Arbogast BWC 2 at 00:05–25; Doc. 197 at 10 (PMF 31). As Mr. Eze resisted, he moved his hands near Officer Arbogast's thigh and hip several times.[7] *See* Arbogast BWC 2 at 00:09–13; Bustamante Video Slowed at 00:11–13, 00:18–20, 00:20–22, 00:37–39; Doc. 178 at 12 (DMF 33–35); Doc. 197 at 10–11 (PMF 33–35).

---

[6] Defendant Lunsford characterizes this sequence of events as Mr. Eze "fight[ing] back against both officers." *See* Doc. 178 at 11. Plaintiffs do not dispute this characterization, and they acknowledge that "Eze does resist Lunsford and appears to be trying to stand up." Doc. 197 at 10. Both fighting and merely trying to stand up are characterizations of Mr. Eze's resistance.

[7] The characterization of Mr. Eze's hand placement is disputed. Defendant Lunsford contends Mr. Eze was reaching for Officer Arbogast's pistol and Taser, not trying to stand up. Doc. 178 at 12 (DMF 33–35). Plaintiffs argue that Mr. Eze was merely trying to stand up. Doc. 197 at 10–11 (PMF 33–35). The video evidence does not blatantly contradict either version, so for the purposes of Defendant Lunsford's motion, the Court treats Mr. Eze's hand placements as attempts to stand up.

11

As the struggle continued, Mr. Eze came to possess Officer Arbogast's Taser.[8] Bustamante Video

Slowed at 00:39–42; Doc. 178 at 12 (DMF 35, 37); Doc. 197 at 11–12 (PMF 36–37). Defendant

Lunsford reached over Mr. Eze to grab the Taser but could not reach it. Bustamante Video Slowed

at 00:40; Doc. 197 at 11 (PMF 37) ("Lunsford reaches to grab the Taser, something the Defense

does not note.").



603

Doc. 179, Ex. P, Bustamante Video Frames at 603.

---

[8] Plaintiffs' argument that Mr. "Eze did not possess the Taser" is blatantly contradicted by the video
evidence.

A split-second before Defendant Lunsford shot Mr. Eze, an officer yelled, "Taser!"[9] Arbogast BWC 2 at 00:24–26; Lunsford BWC at 18:58–19:00. Defendant Lunsford, without warning, drew his pistol and shot Mr. Eze in the head—killing Mr. Eze instantly. Doc. 178 at 13 (DMF 42–43); Doc. 197 at 12 (PMF 42–43).

## DISCUSSION

Plaintiffs seek summary judgment against Defendant Lunsford on Count I of their Second Amended Complaint. Doc. 165 at 2–3. Defendant Lunsford seeks summary judgment as to Count I of the Second Amended Complaint. Doc. 178 at 1. Defendant Lunsford asserts that his use of deadly force was reasonable and that he is entitled qualified immunity. *Id.* at 25. The Court agrees in part.

## I.    <u>Defendant Lunsford's Motion for Partial Summary Judgment.</u>

Defendant Lunsford contends that his use of deadly force was objectively reasonable under the totality of the circumstances, and in the alternative, he argues he is entitled to qualified immunity. *Id.* The Court addresses each argument in turn.

In ruling on Defendant Lunsford's motion for summary judgment, the Court must view the evidence in the light most favorable to the Plaintiffs and draw all reasonable inferences in their favor as they are the non-moving party for the purposes of Defendant Lunsford's Motion. *See Baca*, 128 F.4th at 1324 (citing *Tolan v. Cotton*, 572 U.S. 650, 656–67 (2014)). The Court accepts facts clearly depicted in the video footage to the extent they "dispel any genuine dispute about

---

[9] It is disputed that Defendant Lunsford yelled, "Taser!" Defendant Lunsford argues he yelled it, but the video evidence does not definitively depict him yelling it as opposed to Officer Arbogast. Doc. 178 at 13 (DMF 41). Plaintiffs contend that the voice appears to be "coming from Arbogast, not Lunsford." Doc. 197 at 12 (PMF 41). Plaintiffs appear to imply that this dispute is material because it would demonstrate that Defendant Lunsford did not see the Taser. However, this dispute is immaterial, because Plaintiffs note, and the video evidence demonstrates, that Defendant Lunsford "reaches to grab the Taser." Doc. 197 at 11 (PMF 37); Bustamante Video Frames at 603.

those facts." *Id.* (citing *Scott*, 550 U.S. at 380–81). But if the video evidence does not clearly depict an action, and the evidence can reasonably be interpreted to support either party's version, the Court must take the Plaintiffs' version of what happened. *Id.*

Section 1983 provides that any person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores v. Henderson*, 101 F.4th 1185, 1192–93 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Baca*, 128 F.4th at 1324–25. To meet that burden, Plaintiffs must show (1) that Defendant Lunsford's alleged conduct violated Mr. Eze's constitutional rights, and (2) that "Supreme Court or published Tenth Circuit cases, or the weight of authority from other courts, existing at the time of the violation, clearly established that such conduct constituted a violation of that right." *See id.* (citing *Sanchez v. Guzman*, 105 F.4th 1285, 1292 (10th Cir. 2024). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *Mullenix*, 577 U.S. at 11).

**A. The Court finds that Defendant Lunsford violated the Constitution.**

Defendant Lunsford argues that his use of deadly force was objectively reasonable under the totality of the circumstances. Doc. 178 at 17. Plaintiffs contend that Defendant Lunsford's use

of deadly force was objectively unreasonable and violated the Constitution. Doc. 197 at 18–24. The Court agrees.

Fourth Amendment claims of excessive force are considered "under a standard of objective reasonableness, judged from the perspective of a reasonable officer on the scene." *Id.* (quoting *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015). A court needs not "examine the subjective understanding of the particular officer involved," *Burke v. Pitts*, 157 F.4th 1326, 1339 (10th Cir. 2025) (quoting *Heien v. North Carolina*, 574 U.S. 54, 66 (2014)), because "the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force," *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017). A plaintiff must prove that an officer's actions were "objectively unreasonable." *Est. of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1060 (10th Cir. 2020). "The reasonableness of an officer's actions depends both on whether the officers were in danger at the precise moment that they used force and on whether the officer's own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Baca*, 128 F.4th at 1325 (quoting *Tenorio*, 802 F.3d at 1164 (cleaned up)). The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Est. of Valverde*, 967 F.3d at 1060 (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). "The Constitution is not blind to the fact that police officers are often forced to make split-second judgments." *Id.* (citing *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015)).

In considering whether force was reasonable, a court considers the three *Graham* factors, none of which are dispositive: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively

resisting arrest or trying to flee. *Id.* (citing *Graham*, 490 U.S. at 396). However, the *Graham* factors are "nonexclusive and not dispositive; the inquiry remains focused on the totality of the circumstances." *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023).

### 1. Severity of the crimes.

Defendant Lunsford arrived at the gas station in response to a call alleging that Mr. Eze had shoplifted a beer. Lunsford BWC at 2:18–3:08. The alleged crime Defendant Lunsford responded to is a petty misdemeanor. *See* N.M. Stat. Ann. § 30-16-20(B)(1) (2006) (noting that when the value of shoplifted merchandise is less than $250, the shoplifter "is guilty of a petty misdemeanor"). As Defendant Lunsford questioned Mr. Eze, Mr. Eze repeatedly gave him false identifiers that did not come back on file. *Id.* at 4:24–5:20; 14:33–16:46. Concealing one's identity in such a fashion is a petty misdemeanor. *See* N.M. Stat. Ann. § 30-22-3 (1963) ("Whoever commits concealing identity is guilty of a petty misdemeanor.").

Defendant Lunsford contends that Mr. Eze committed the felony crime of disarming a peace officer. Doc. 178 at 19. Section 30-22-27 (1997) provides that:

A. Disarming a peace officer consists of knowingly:
(1) Removing a firearm or weapon from the person of a peace officer when the officer is acting within the scope of his duties; or
(2) Depriving a peace officer of the use of a firearm or weapon when the officer is acting within the scope of his duties.

Plaintiffs state that "there is no evidence in the video that Eze tried to disarm Arbogast." Doc. 197 at 6. Rather, Plaintiffs argue that their forensic expert evidence demonstrates that Mr. Eze did not reach for Officer Arbogast's taser, Officer Arbogast lost control of his taser, and when "Mr. Eze touched the taser he never pointed the device at either officer even though he had the opportunity to do so." *Id.*; Doc. 197, Ex. 2, Expert Report by Jason C. Fries at 21. For several reasons, even viewing the evidence in the light most favorable to Plaintiffs, the Court disagrees.

Mr. Eze acted knowingly when he took possession of Officer Arbogast's taser. Direct evidence of knowledge and intent are rarely available, *State v. Glascock*, 2008-NMCA-006, ¶ 29, 143 N.M. 328, 176 P.3d 317. and thus, intent and knowledge may be proved by circumstantial evidence, *State v. Montoya*, 1966-NMSC-224, ¶ 10, 77 N.M. 129, 419 P.2d 970. The video evidence plainly demonstrates that Mr. Eze took possession of Officer Arbogast's taser. Bustamante Video Slowed at 00:39–43. Mr. Eze's possession and control of the Taser yields the reasonable inference that he knew that intentionally grabbing the Taser would deprive Officer Arbogast of using it. *See State v. Ortiz*, 2017-NMCA-006, ¶ 23, 387 P.3d 323.

Even using Plaintiffs' version of events and construing the reasonable inferences derived from the video evidence in their favor, Mr. Eze still disarmed Officer Arbogast. At some points, Plaintiffs contend Mr. Eze "did not possess the Taser," Doc. 197 at 11, and at other points they contend that Mr. Eze was "holding then pressing the Taser into the ground to prevent the officers [from] using the loose Taser against him," Doc. 165 at 5. The video evidence plainly contradicts Plaintiffs' contention that Mr. Eze did not possess the Taser. Bustamante Video Slowed at 00:39–43. Accepting the reasonable inference that Mr. Eze possessed the Taser to prevent the officers from using it against him does not mean that Mr. Eze did not "disarm" Officer Arbogast under New Mexico law. "The plain language of the statute penalizes a defendant for depriving an officer of the use of a [weapon] *at any point* during the officer's acting within the scope of his duties," *Ortiz*, 2017-NMCA-006, ¶ 27, and therefore, it is immaterial whether Mr. Eze took possession of Officer Arbogast's Taser to use it against the officers or to prevent them from using the Taser against him. Plaintiffs' own version of the facts indicates that Mr. Eze took control of the Taser to deprive Officer Arbogast of the use of the Taser. *See* Doc. 165 at 5 (noting that Mr. Eze was "holding then pressing the Taser into the ground to prevent the officers for [sic] using the loose

17

Taser against him."). Officer Arbogast was clearly acting within the scope of his duties. Accordingly, even after taking Plaintiffs' version of events and construing reasonable inferences in their favor, it is apparent the Mr. Eze committed the felony of disarming a peace officer under New Mexico law.

Although the initial crimes were low level, the crimes committed over the course of the encounter rose to a felony level which weighs against Plaintiffs. *See Palacios*, 61 F.4th at 1256 ("When the crime at issue is a felony . . . the crime is considered to have a high degree of severity which weighs against the plaintiff.").

### 2.  Immediate threat of serious physical harm.

The second *Graham* factor has been termed the "most important." *Baca*, 128 F.4th at 1326 (citing *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 763 (10th Cir. 2021)). In a deadly-force case, such as this, this factor asks whether Mr. Eze posed "an immediate threat of serious physical harm" to Defendant Lunsford or others. *Id.* This means that Defendant Lunsford's use of deadly force was "unreasonable unless at the instant he fired his shots, a reasonable officer on the scene would have believed that [Mr. Eze] posed an immediate threat of serious physical harm to himself or others." *Id.* (citing *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)).

In assessing the degree of threat facing the officers, the Court considers the four *Larsen* factors: (1) "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands"; (2) "whether any hostile motions were made with the weapon towards the officers"; (3) "the distance separating the officers and the suspect"; and (4) "the manifest intentions of the suspect." *Id.* (quoting *Est. of Larsen*, 511 F.3d at 1260 (10th Cir. 2008)).

As to the first *Larsen* factor, neither officer ordered Mr. Eze to drop the Taser. *See* Lunsford BWC at 17:50–18:58; Arbogast BWC 2 at 00:00–23. However, Mr. Eze did not comply with any

of the officers' orders leading up to the shooting. In response to Defendant Lunsford's order to step out of the car, Mr. Eze said, "No, I don't really want to get out." Lunsford BWC at 17:50. Mr. Eze appeared to acquiesce only after the officers began pulling him out of the vehicle. *Id.* at 17:55–18:15. Officer Arbogast ordered Mr. Eze to turn around, and Mr. Eze tensed his body and pulled the officers toward the rear of the vehicle. *Id.* at 18:26–32. As Mr. Eze resisted arrest, Defendant Lunsford can be heard saying, "Dude, stop!" *Id.* at 18:27. Although neither officer ordered Mr. Eze to drop the Taser, Mr. Eze did not comply with any of the officers' orders prior to and during the physical altercation. Because Mr. Eze did not possess the Taser at the beginning of the altercation, the officers could do little more than order Mr. Eze to comply—which he did not. *See Est. of Valverde*, 967 F.3d at 1061–62 (citing *Garner*, 471 U.S. at 11–12) ("But when the suspect is not holding a gun when the confrontation begins, officers can do little more than what they did in this case: order the suspect to raise his hands and get to the ground."). Accordingly, the first *Larsen* factor slightly weighs in favor of Defendant Lunsford.

The second *Larsen* factor reveals a dispute of fact as to whether Mr. Eze merely held the Taser to prevent it from being used on himself, Doc. 165 at 5, or whether he was trying to activate the Taser, Doc. 178 at 21. Relatedly, this factor is impacted by another disputed fact: whether Mr. Eze was placing his hands near Officer Arbogast's waist and thigh merely trying to stand up, Doc. 197 at 10–11, or whether he was grabbing at Officer Arbogast's gun and Taser attempting to disarm him, Doc. 178 at 21; Doc. 200 at 5. The video evidence can reasonably be interpreted either way. Since Defendant Lunsford seeks summary judgment, the Court must view the video evidence in the light most favorable to Plaintiffs. *See Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020). Thus, for the purpose of Defendant Lunsford's summary judgment motion, the Court finds

that Mr. Eze placed his hands near Officer Arbogast's thigh and waist in an effort to stand up, not to obtain a weapon.

Plaintiffs' version of events indicates that Mr. Eze came into possession of Officer Arbogast's Taser after Arbogast lost control over the Taser. Doc. 197 at 11. Plaintiffs also contend that Mr. Eze never pointed the Taser at an officer and he simply held it away from the officers to prevent them from using it on him. Doc. 165 at 5. At the moment Mr. Eze was shot, he was holding the Taser with his right hand, and he was pointing it away from both officers. Bustamante Video Slowed at 00:43. Although "officers are not required to 'await the glint of steel' before taking protective action," *Palacios*, 61 F.4th at 1262 (quotation omitted), Tenth Circuit precedent indicates that some action greater than mere possession of an officer's Taser is required before an officer uses lethal force without warning. *See Cruz*, 138 F.4th at 1264 (affirming qualified immunity when suspect partially rotated barrel of airsoft gun with the orange tip painted black toward officers); *Alcala v. Ortega*, 128 F.4th 1298, 1304, 1308–09 (10th Cir. 2025) (finding reasonable fear of immediate and deadly threat when suspect "twisted to his left and swung his right hand up with his index finger pointing, as if drawing a gun"); *Est. of Taylor*, 16 F.4th at 750 (affirming qualified immunity when suspect rapidly moved hand in a motion "consistent with the drawing of a gun"); *Thomson*, 584 F.3d at 1318 (affirming qualified immunity when "the gun still was pointed toward the officers almost immediately prior" to the shooting). Not only was Mr. Eze in possession of a Taser, not a firearm or something that appeared to be a firearm, but the video evidence does not demonstrate that Mr. Eze made a sudden movement toward either officer with the Taser. Requiring some motion indicating hostile movement is consistent with how the Tenth Circuit has treated hostile motions with weapons that are not firearms. *See Baca*, 128 F.4th at 1326 ("We have held that it is unreasonable for an officer to use deadly force where the 'officer had

20

reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him.'"). Viewing the video in the light most favorable to Plaintiffs demonstrates that Mr. Eze made no hostile motion with the Taser towards either officer.

As to the third *Larsen* factor, the distance separating Mr. Eze from the officers weighs in favor of Defendant Lunsford. Mr. Eze was on top of Officer Arbogast and Defendant Lunsford was attempting to restrain Mr. Eze from behind. Bustamante Video Slowed at 00:39–43. Not only were the officers in very close physical proximity to Mr. Eze, but there was no chance of finding cover once Mr. Eze obtained the Taser. *See Cruz v. City of Deming*, 138 F.4th 1257, 1269 (10th Cir. 2025) (noting that "the lack of cover . . . would likely weigh in favor of the officers"). Thus, the third *Larsen* factor favors Defendant Lunsford.

The fourth *Larsen* factor, the manifest intentions of Mr. Eze, weighs in Plaintiffs' favor when viewing the evidence in the light that favors Plaintiffs. This *Larsen* factor also demonstrates a second genuine dispute of a material fact: whether Mr. Eze reached for Officer Arbogast's duty weapon and Taser, or whether Mr. Eze was attempting to stand up. Viewing the evidence in Plaintiffs' favor, the video evidence demonstrates that Mr. Eze's hand placements near Officer Arbogast's waist and thigh were not attempts to obtain his duty weapon or Taser but were attempts to stand up. Doc. 197 at 10, 12. Additionally, Mr. Eze's possession of the Taser, when viewed in the light favorable to Plaintiffs, demonstrates a manifest intention of possessing the Taser so he would not be tased—rather than an intention to use the Taser against the officers. Doc. 165 at 5. Should a reasonable juror view the evidence in the light that favors Plaintiffs, the video evidence demonstrates that Mr. Eze's manifest intentions were to resist arrest and prevent the officers from tasing him. These disputes are material because such views of the video evidence would lead a

21

reasonable juror to conclude that Mr. Eze's resistance and possession of the Taser did not pose an immediate threat of serious physical harm to either officer.

### 3. Actively resisting arrest.

The third *Graham* factor favors Defendant Lunsford because Mr. Eze was actively resisting. The parties do not dispute that the third factor favors Defendant Lunsford. Doc. 178 at 24; Doc. 197 at 20. From the moment Mr. Eze is asked to step out of the car, he is resisting arrest. *See* Lunsford BWC at 17:50–18:59; Arbogast BWC 1 at 1:35–2:09; Arbogast BWC 2 at 00:00–25. Thus, the Court finds that the third *Graham* factor weighs against Plaintiffs.

Therefore, viewing the video evidence and reasonable inferences in the light most favorable to Plaintiffs, the Court finds that the *Graham* factors favor Plaintiffs.

### 4. Additional considerations.

Plaintiffs contend that the shooting was presumptively unreasonable because Defendant Lunsford did not warn Mr. Eze that he intended to use deadly force. Doc. 165 at 17–19; Doc. 198 at 11–12; Doc. 197 at 23–24. Defendant Lunsford argues that warnings are required when feasible, and a warning was not feasible here. Doc. 180 at 8; Doc. 200 at 6, 9.

"The Supreme Court has held that 'where feasible, some warning [must be] given' before an officer may constitutionally use deadly force against a suspect threatening to inflict serious physical harm." *Est. of Smart ex rel. Smart v. City of Wichita*, 951 F.3d 1161, 1174 (10th Cir. 2020) (quoting *Garner*, 471 U.S. at 11–12). "A warning is not invariably required even before the use of deadly force . . . ." *Thomson*, 584 F.3d at 1321. The "warning does not need to be specifically that officers are about to open fire." *Palacios*, 61 F.4th at 1259 (citing *Thomson*, 584 F.3d at 1318–19).

Here, Defendant Lunsford gives no warning before using deadly force. The inquiry becomes whether it was feasible to give a warning. *See Est. of Smart*, 951 F.3d at 1174. The Court

notes that its calculus must account for Defendant Lunsford's need to make a "split-second" judgment. *See Burke*, 157 F.4th at 1339. However, Defendant Lunsford did not issue a single command or warning. Defendant Lunsford reached over Mr. Eze toward the Taser and unholstered his weapon before shooting Mr. Eze. Bustamante Video Slowed at 00:39–44. The Tenth Circuit has held that a command such as "drop it" may suffice, *see Palacios*, 61 F.4th at 1259, but it has also acknowledged that other courts have not required a warning "when officers are faced with rapidly evolving circumstances involving deadly threats," *Est. of Smart*, 951 F.3d at 1175. This case undoubtedly involves rapidly evolving circumstances, but it is less certain whether Mr. Eze's possession of the Taser, pointing away from and not moving toward either officer, constitutes a deadly threat. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) (describing a Taser as "a weapon that . . . caus[es] temporary paralysis and excruciating pain" and noting that "Tasers may not constitute deadly force"). Because a Taser does not necessarily constitute deadly force, but it is capable of inflicting "serious physical harm," "'where feasible, some warning [must be] given' before an officer may constitutionally use deadly force." *Est. of Smart*, 951 F.3d at 1174. The only warnings or commands given to Mr. Eze occurred before he obtained Officer Arbogast's Taser. *See* Lunsford BWC at 17:40–18:37. While the warning need not specifically be "that officers are about to open fire," a warning, when feasible, still must occur. Given that the Taser never began moving to be pointed toward the officers and, per Plaintiffs' version of events, Mr. Eze was not trying to activate the Taser, it would have been feasible to issue a brief warning such as "drop it" before shooting Mr. Eze. Thus, construing the evidence in the light most favorable to Plaintiffs, the Court finds that Defendant Lunsford violated the Constitution when he failed to even briefly warn Mr. Eze before using deadly force.

In their motion for summary judgment, Plaintiffs appear to make the argument that Defendant Lunsford recklessly created the need to use deadly force. *See* Doc. 165 at 19.

Reasonableness of the use of force also depends on "'whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Pauly*, 874 F.3d at 1219 (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004)). Courts "consider an officer's conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force." *Id.* at 1220 (quoting *Allen v. City of Muskogee*, 119 F.3d 837, 840 (10th Cir.1997)). An officer's conduct "prior to a suspect threatening force 'is only actionable if it rises to the level of recklessness.'" *Id.* (quoting *Thomson*, 584 F.3d at 1320).

Plaintiffs point to the "officers' 36 seconds of recklessness" involving "pulling Eze from the car, failing to communicate a plan, the throwing him to the ground, the failing to communicate to Eze to drop the Taser, the failing to warn an intent to us [sic] deadly force, the failure to use his own Taser, his own baton, his own fists, [and] his own voice." Doc. 165 at 19. The Court finds that Defendant Lunsford's conduct leading up shooting Mr. Eze did not rise to the level of recklessness. Defendant Lunsford acted reasonably in removing Mr. Eze from the vehicle once he had authority to detain him and Mr. Eze resisted. Defendant Lunsford did not conduct the takedown on Mr. Eze. To say that the officers should have known that attempting to arrest Mr. Eze in this manner "would create a need to shoot [him] is to indulge in the very sort of hindsight revision the law forbids." *Clark v. Colbert*, 895 F.3d 1258, 1264 (10th Cir. 2018).

Furthermore, Defendant Lunsford's prior conduct is not "immediately connected" to the suspect's threat of force given that Mr. Eze independently took control of the Taser after Officer Arbogast lost control of it. One important factor in identifying "immediately connected conduct is the amount of time between the officer's actions and the use of force." *Arnold v. City of Olathe*,

24

35 F.4th 778, 790 (10th Cir. 2022). Here, Defendant Lunsford had arrived approximately fifteen minutes before the shooting occurred which suggests that Defendant Lunsford's conduct is not immediately connected to the need to use force. *See Allen*, 119 F.3d at 841 (finding an officer's conduct was immediately connected when shooting occurred only 90 seconds after arrival); *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1216 (10th Cir.2019) (finding an immediate connection because the shooting occurred within one minute of arriving). Defendant Lunsford's conduct that may be considered "immediately connected" would be pulling Mr. Eze from the vehicle which was reasonable given Mr. Eze's concealment of identity. Mr. Eze created intervening events such as resisting arrest and taking possession of Officer Arbogast's Taser. Accordingly, the Court finds that Defendant Lunsford did not recklessly create the need to use deadly force.

However, under the totality of the circumstances and construing the video evidence and inferences in favor of Plaintiffs, the Court finds that Plaintiffs have met their burden demonstrating that a reasonable jury could find that Defendant Lunsford unreasonably used deadly force against Mr. Eze thereby violating the Constitution.

## B. Defendant Lunsford is entitled to qualified immunity.

Plaintiffs argue that "the defense has conceded that Lunsford and others were not in imminent danger from Eze" and that the law clearly established that "shooting an unarmed person who poses no immediate threat is unlawful."[10] Doc. 197 at 24. Defendant Lunsford contends that

---

[10] Not only does the video evidence blatantly contradict the sentiment that Mr. Eze was "unarmed," but the defense did not concede that no imminent threat existed. *See* Doc. 178 at 15; Doc. 200 at 2, 7. Plaintiffs assume that, since Defendant Lunsford has pled his Fifth Amendment right, an adverse inference yields the conclusion that no imminent threat existed or that Defendant Lunsford perceived no threat. Doc. 197 at 21–22. Plaintiffs claim that "the central question is whether Lunsford reasonably believed that Eze presented an immediate threat of death or great bodily harm," *id.* at 22, but "the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force," *Pauly*, 874 F.3d at 1215. The Supreme Court specified that the inquiry is whether the officer's actions are objectively

there was not clearly established law putting him on notice that his conduct violated the Constitution. Doc. 178 at 2, 26–27. The Court agrees.

An officer who violates the Constitution is still entitled to qualified immunity unless the plaintiffs demonstrate that the violation "was clearly established at the time of the shooting." *Baca*, 128 F.4th at 1327. The Tenth Circuit does not require a "scavenger hunt for a prior case with identical facts." *Id.* (quoting *Sanchez v. Guzman*, 105 F.4th 1285, 1292 (10th Cir. 2024)). "While there does not have to be a case that is factually identical, it must still be apparent to a reasonable officer in light of pre-existing law that his conduct was unlawful." *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010). A right is clearly established when precedent encompasses "materially similar conduct" or applies "with obvious clarity" to the conduct at issue. *Burke*, 157 F.4th at 1343 (quoting *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022)). Thus, "cases holding less egregious, similar conduct unconstitutional would provide fair warning that more egregious conduct is unlawful." *Id.* (citing *McCowan v. Morales*, 945 F.3d 1276, 1286 (10th Cir. 2019)). But unless "existing precedent 'squarely governs' the specific facts at issue, the police officer is entitled to qualified immunity." *Arnold*, 35 F.4th at 793 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). Plaintiffs bear the burden of citing cases that constitute clearly established law. *See Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015) (noting the "well-settled rule that '[t]he *plaintiff* bears the burden of citing to us what he thinks constitutes clearly established law'" (quoting *Thomas*, 607 F.3d at 669)); *Sanchez v. Guzman*, 105 F.4th 1285, 1294 (10th Cir. 2024) ("The

---

reasonable "in light of the facts and circumstances confronting them, without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397. Thus, Defendant Lunsford's lack of testimony does not demand adverse inferences that blatantly contradict much of the submitted video evidence and transform the inquiry into a subjective one.

26

plaintiff must demonstrate on the facts alleged . . . that the right was clearly established at the time of the alleged unlawful activity.").

### 1. Shooting a suspect who takes full control of an officer's Taser.

In asserting that the law is clearly established as to the violation of Mr. Eze's rights, Plaintiffs direct the Court, in a single paragraph, to *Burke v. Pitts*, 157 F.4th 1326 (10th Cir. 2025) and *Baca v. Cosper*, 128 F.4th 1319 (10th Cir. 2025). Doc. 197 at 24. Before the Court addresses each case, the Court notes a fundamental defect in Plaintiffs' argument: the shooting occurred in 2022, and the only cases Plaintiffs cite were decided in 2025. Qualified immunity clearly demands that precedent "existing at the time of the violation, clearly established that such conduct constituted a violation of that right." *Baca*, 128 F.4th at 1324–25; *see also Kisela*, 584 U.S. at 104 (noting that "police officers are entitled to qualified immunity unless *existing* precedent 'squarely governs' the specific facts at issue" (emphasis added)). The cases Plaintiffs contend clearly establish the constitutional violation did not even exist at the time of the violation.

Plaintiffs contend that "[i]t is clearly established that shooting an unarmed person who poses no immediate threat is unlawful." *Id.* (citing *Burke*, 157 F.4th at 1345). Even if the Court construes the video evidence and reasonable inferences in Plaintiffs' favor and finds that Mr. Eze did not pose an immediate threat, Mr. Eze was not unarmed. Bustamante Video Slowed at 00:43. The video evidence blatantly contradicts the argument that Mr. Eze was "unarmed" when Defendant Lunsford shot him, and thus, the Court does not accept the notion that he was "unarmed." *See Emmett*, 973 F.3d at 1131 ("[W]e rely on the video footage only where it 'blatantly contradict[s]' Emmett's story."). Furthermore, Plaintiffs contend that Mr. Eze did not pose an immediate threat to either officer because the Taser was never pointed at them. Doc. 197 at 6. *Burke* does not stand for the proposition that a suspect who does not point an Officer's Taser back

27

at them does not present an immediate threat of serious physical harm. Rather, *Burke* stands for the proposition that shooting an *unarmed*, moving suspect who is unthreatening and under the influence of drugs violates the Constitution. 157 F.4th at 1348. The suspect in *Burke* moved "towards the bedroom door without any weapon or black object in his hands." *Id.* at 1346. Mr. Eze was actively resisting and armed himself with Officer Arbogast's Taser unlike the decedent in *Burke*. *See* Bustamante Video Slowed at 00:38–44. Therefore, *Burke* does not clearly establish that an officer who uses deadly force on a suspect who is actively resisting arrest and in full control of an officer's Taser violates the Constitution.

Plaintiffs do not indicate how *Baca* clearly establishes that Mr. Eze's constitutional rights were violated, but they "contend that the qualified immunity analysis in *Baca* applies equally here." Doc. 197 at 24. *Baca* found and applied the clearly established proposition that when "an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." 128 F.4th at 1328 (quoting *Tenorio*, 802 F.3d at 1165–66). Factually, it is unclear why "*Baca* applies equally here" as Plaintiffs contend. The decedent in *Baca* was a 75-year-old woman who, suffering from dementia, had become aggressive and threatened to kill her daughter and granddaughter. 128 F.4th at 1321. An officer arrived and the decedent was "holding only knives" and she was not charging the officer or making any slicing or stabbing motions toward him. *Id.* at 1326. Based on these facts, the Tenth Circuit found that the defendant-officer was not entitled to summary judgment because law clearly established that such a fact pattern did not warrant deadly force. *Id.* at 1328. Here, Mr. Eze, a 36-year-old man who was 6 feet 2 inches tall and weighed 211 pounds, was physically resisting arrest and took possession of an officer's Taser before he was shot. *See* Doc. 178, Ex. F, OMI

28

Report 2. Moreover, Mr. Eze was involved in a physical struggle with no space separating him and the officers, *see* Bustamante Video Slowed at 00:00–40, but in *Baca*, the decedent and officer were separated by about six feet, 128 F.4th at 1324.

Even if the Court looks to cases cited in *Baca* and other Tenth Circuit case law to derive a broad principle that some hostile motion typically must be made before deadly force can be used, Defendant Lunsford is still entitled to qualified immunity.[11] That principle still does not clearly establish law that helps Plaintiffs' claim survive qualified immunity given that the hostile motion prerequisite has not been used in addressing a situation where a suspect takes control of an officer's weapon.

A prerequisite aggressive or hostile action is present throughout Tenth Circuit case law when a suspect is equipped with their own weapon. In cases in which a suspect is believed to only be holding a knife, the Tenth Circuit has found that when the suspect is not charging the officer and not making slicing or stabbing motions toward the officer, it is unreasonable to use deadly force. *See Tenorio*, 802 F.3d at 1166; *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006). In cases involving a suspect possibly in possession of a firearm, the Tenth Circuit has affirmed grants of qualified immunity when the suspect makes some threatening motion with a firearm or what appears to be a firearm. *See Est. of Taylor*, 16 F.4th at 750 (affirming qualified immunity when suspect rapidly moved hand in a motion "consistent with the drawing of a gun"); *Thomson*, 584 F.3d at 1318 (affirming qualified immunity when "the gun still was pointed toward the officers almost immediately prior" to the shooting). When a suspect poses a threat with their vehicle, the

---

[11] Although Plaintiffs fail to meet their burden given the cases they cited, the Court will conduct its own analysis to ensure the lack of clearly established law. *See Love v. Grashorn*, 134 F.4th 1109, 1117 (10th Cir. 2025) ("But once the plaintiffs urged a clearly established right . . . we incurred an obligation to conduct our own legal research to determine the clarity of a constitutional violation.").

Tenth Circuit has usually required some sort of motion in the officer's direction when affirming grants of qualified immunity. *See Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1209–10 (10th Cir. 2017) (finding use of deadly force reasonable when vehicle moved slowly toward officer); *Thomas*, 607 F.3d at 671 (finding use of deadly force reasonable when suspect drove car "slowly and deliberately" toward an officer).

Although these cases indicate that some hostile movement typically must occur prior to the use of deadly force, such case law is balanced against "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Burke*, 157 F.4th at 1339. Moreover, the Tenth Circuit and Supreme Court have cautioned against "[a]bstracting" holdings to a novel situation in a manner that "defines the qualified immunity inquiry at too high a level of generality." *Est. of Smart*, 951 F.3d at 1174 (quoting *Mullenix*, 577 U.S. at 16). Abstracting these cases to derive a broad principle that can be applied to this novel situation "conflates the two prongs" of the qualified immunity inquiry. *See id.* The Court will not do so.

Here, Mr. Eze took possession of Officer Arbogast's Taser, and it was pointed away from both officers. *See* Bustamante Video Slowed at 00:38–44. Viewing facts and inferences in the light most favorable to Plaintiffs, the Court notes that Mr. Eze's hand placement near Officer Arbogast's thigh and waist cannot be construed as attempts to obtain a weapon or batter Officer Arbogast; rather, these were Mr. Eze's attempts to resist arrest and stand up. Given that the video evidence does not depict Mr. Eze pointing the Taser at the officers or clearly trying to activate the Taser, the Court accepts Plaintiffs' explanation that Mr. Eze held the Taser, after Officer Arbogast lost control of it, to prevent it from being used against him. Doc. 165 at 5. However, viewing the facts and reasonable inferences in Plaintiffs' favor does not negate the fact that Mr. Eze took control of

30

Officer Arbogast's weapon. It has not been clearly established whether the act of taking control of an officer's Taser, even if the officer lost control of it, constitutes a hostile action presenting an immediate threat of serious physical harm rendering the use of deadly force reasonable.

Further, the Tenth Circuit has not directly addressed the issue of whether deadly force is reasonable when a suspect, during a physical struggle resisting arrest, takes control of an officer's Taser.[12] However, the Tenth Circuit has held that deadly force was reasonable when an officer was uncertain whether a suspect was armed and the suspect "advanced on [the officer] in what reasonably appear[ed] to be an effort to get [the officer's] weapon." *Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005). The officer in *Blossom* shot the decedent when he was 5–7 feet away. *Id.* at 965. Here, the video evidence clearly demonstrates that Mr. Eze took full control over Officer Arbogast's Taser moments before Defendant Lunsford shot him without warning. Bustamante Video Slowed at 00:39–44. Here, the officers were in an active, physical struggle on the ground and not separated by several feet. *Id.* Defendant Lunsford briefly reached for Officer Arbogast's Taser in Mr. Eze's hand but could not reach it over Mr. Eze. *See id.* at 00:39–40. Defendant Lunsford then unholstered his firearm and shot Mr. Eze in the head. *Id.* at 00:40–44. The decedent in *Blossom* verbally threatened the officer who was alone, here, Mr. Eze did not

---

[12] The Court takes note of *Cantu v. City of Dothan*, 974 F.3d 1217 (11th Cir. 2020), a similar but non-binding case. The Eleventh Circuit reversed a grant of qualified immunity in large part because when the decedent "grabbed at the taser in an attempt to avoid being tased again, he and two of the three officers struggled over it, but [the decedent] never gained control of it." *Id.* at 1235. Although he never gained control of it, the defendant-officer let go of the taser and "fatally shot him without warning, all in the space of three seconds." *Id.* Here, the video evidence clearly establishes that Mr. Eze gained independent control of Officer Arbogast's Taser unlike the decedent in *Cantu*. Defendant Lunsford reached toward the Taser which Mr. Eze controlled but could not reach it. *See* Bustamante Video Slowed at 00:39–40; Doc. 197 at 11 (PMF 37). Defendant Lunsford did not let go of his partial control of the Taser and then shoot Mr. Eze like the officer in *Cantu*. Although *Cantu* presents a similar fact pattern, *Cantu* differs in the pivotal fact that the officers in Cantu outnumbered the decedent 3 to 1 and the officer had partial control of the Taser before relinquishing the partial control to shoot the decedent.

verbally threaten the officers and Defendant Lunsford was not alone. But the decedent in *Blossom* merely attempted to grab the officer's weapon and Mr. Eze fully possessed Officer Arbogast's Taser. Thus, in light of Supreme Court and Tenth Circuit precedent, the Court finds that no clearly established law would have placed an officer on notice that, when a suspect resisting arrest takes control of an officer's Taser, use of deadly force is unreasonable and unconstitutional.

### 2.  Failure to warn Mr. Eze.

Plaintiffs argue that Defendant Lunsford violated the Constitution when he shot Mr. Eze without warning him that he intended to use deadly force. Doc. 197 at 24. However, Plaintiffs do not put forth any argument or case law that a failure to warn in these circumstances is clearly established.

"The Supreme Court has held that 'where feasible, some warning [must be] given' before an officer may constitutionally use deadly force against a suspect threatening to inflict serious physical harm." *Est. of Smart*, 951 F.3d at 1174 (quoting *Garner*, 471 U.S. at 11–12). "A warning is not invariably required even before the use of deadly force . . . ." *Thomson*, 584 F.3d at 1321.

The Tenth Circuit has not had the opportunity to address whether an officer who uses deadly force without warning a suspect who took control of an officer's Taser violates the Constitution. Plaintiffs contend that Defendant Lunsford had "36 seconds" to "issue verbal commands to Mr. Eze," but neither officer did during the struggle on the ground. Doc. 198 at 12. This misconstrues the time frame that Defendant Lunsford had to issue a warning he intended to use deadly force. Approximately 2.5, no more than 3, seconds passed between the moment when Mr. Eze took control of Officer Arbogast's Taser and when Defendant Lunsford shot him. Doc. 178, Ex. K, Bustamante Video at 00:19–22. Officer Lunsford spent about one second of those three seconds reaching toward the Taser over Mr. Eze before resorting to deadly force. *Id.* at 00:20.

32

Plaintiffs present no argument that there was clearly established law putting Defendant Lunsford on notice that he must warn a suspect who takes independent control of an officer's Taser during a ground struggle prior to using deadly force. The Court has not found case law providing sufficient notice that clearly establishes that an officer must warn a suspect, who takes full, independent control of an officer's Taser, that the officer intends to use deadly force. Therefore, the Court finds that Defendant Lunsford is entitled to qualified immunity on the issue of not warning Mr. Eze of his intent to use deadly force.

Accordingly, the Court finds that Defendant Lunsford is entitled to qualified immunity on the issue of using deadly force, without warning, against a suspect who has taken full, independent control of an officer's Taser during a physical struggle.

### C. Fees and costs.

Defendant Lunsford appends a request for reasonable attorneys' fees and costs to the end of his reply brief without any analysis. Doc. 200 at 10. He requests an award pursuant to 42 U.S.C. § 1988 and D.N.M.LR-Civ. 54. *Id.*

The movant "must submit supporting authority and evidence (affidavits and time records)." D.N.M.LR-Civ. 54.5(a). The motion must also comply with the requirements of Local Rule 7. *Id.* Local Rule 7 requires that the movant "determine whether a motion is opposed" and demonstrate that a good-faith request for concurrence occurred. *See* D.N.M.LR-Civ. 7.1(a).

Defendant Lunsford has not submitted any supporting authority or evidence. No evidence has been presented for the Court to determine whether the fees requested are reasonable. The motion does not comply with Rule 7 given that the request was made in a single sentence at the end of a reply brief for his motion for summary judgment, and it does not determine whether the motion is opposed or demonstrate that a request for concurrence occurred. *See* D.N.M.LR-Civ.

7.1(a). Since the one sentence request does not provide the Court with sufficient evidence to determine that the fees are reasonable and the motion does not comply with Rule 7, the Court will deny the request. However, Defendant Lunsford may properly renew the request, in a manner that complies with the Local Rules and provides the Court with the relevant hourly fee data, at a later time.

## CONCLUSION

Given that the Court finds that Defendant Lunsford is entitled to qualified immunity, Plaintiffs' motion for summary judgment (Doc. 165) as to their count against Defendant Lunsford is denied. Because Defendant Lunsford is entitled to qualified immunity on the use of force and failure to warn issues, the Court grants Defendant Lunsford's motion for partial summary judgment (Doc. 178).

**IT IS THEREFORE ORDERED** that Defendant Lunsford's Motion for Partial Summary Judgment (Doc. 178) is hereby **GRANTED** for reasons described in this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment Against Defendant Brad Lunsford (Doc. 165) is hereby **DENIED** for reasons described in this Memorandum Opinion and Order.

_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE

34